UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| WENDY STEWART, | : | Case No. 3:18-cv-237 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I. Introduction

Plaintiff Wendy Stewart brings this case challenging the Social Security Administration's denial of her application for Supplemental Security Income. She applied for benefits in June 2015, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since May 1, 1998. On the date she applied for Supplemental Security Income, she was thirty-two years old and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a high school education. *See id.* § 416.964(b)(4).

### A. Plaintiff's Testimony

At the hearing, when ALJ Motta asked why she was disabled, Plaintiff responded, "I can't - - I don't - - my anxiety, my PTSD, I freeze up. I start shaking really bad. I - - I don't - - I really [don't] know how to explain it." (Doc. #6, *PageID* #69). She explained that she has always had an issue with communication but, for the past seven years, it has been the worst. *Id.*

Plaintiff struggles with anxiety. She takes medication for anxiety and depression. *Id.* at 73. Her former primary-care doctor prescribed it. *Id.* at 73. However, at the time of the hearing, she was trying to find a new doctor because she "got in trouble" for cussing and arguing with a lady at her doctor's office. *Id.* at 85.

When Plaintiff is anxious, she gets shaky, her palms sweat, her body shakes, she trembles, she gets confused, and she feels a lot of emotion. *Id.* at 79. It happens when someone knocks on the door, when she opens the front door, and when she has to leave the house. *Id.* at 79.

About once a week, when Plaintiff gets mad, starts yelling and screaming, runs into her room, slams the door, and sits inside the door so she does not go back out. *Id.* at 85. She does not like to yell in front of her kids. *Id*.

Plaintiff went to TCN for suboxone treatment but stopped going when she "completed it." *Id*. She also attended group therapy sessions. *Id.* at 70. She stopped treatment at TCN because her doctor asked her too many personal questions about her "past life" and "sex experiences …." *Id*. She instead sees a private counselor, Dr. Rogers, every other week. *Id.* at 70, 84. Dr. Rogers told her that she has a lot of symptoms of PTSD but Plaintiff cannot pinpoint a specific traumatic experience. *Id.* at 84. Nonetheless, Plaintiff believes therapy helps her. *Id.* at 71.

Plaintiff has not used drugs other than marijuana since March 2009. *Id*. At the time of the hearing, she had recently quit smoking marijuana. *Id.* She hopes to move to Colorado so that she could smoke legally. *Id*. Marijuana helps her anxiety "a ton." *Id.* at 81

In addition to her psychological issues, she "just recently started hurting within the last so many years." *Id*. at 69. She has back pain caused by facet's disease. *Id.* at 74. Unfortunately, there is no cure and her doctors told her that it would only get worse. *Id*. She has trouble lifting more than a gallon of milk. *Id.* at 82.

Further, Plaintiff gets nauseated and throws up almost every day. *Id.* at 74. Her doctors cannot determine what is causing her nausea. *Id*. She takes Zofran to help.

Plaintiff has good days and bad days. When she is having a good day, she sits with her younger children, plays, and tries to teach them things. *Id.* at 76, 83. On a bad

day, she yells, screams, and cries. *Id.* at 80. She used to throw things but does not anymore. *Id.* Generally, if she spends more time at home, she has more good days. *Id.* She estimated that she has two to three bad days a week. *Id.* at 81.

Plaintiff has six children who are 3, 4, 8, 13, 17, and 19 years old. *Id.* at 67. The two youngest live with her. *Id.* However, she cannot be alone with her three-year old and four-year old. *Id.* at 81. Her boyfriend usually helps her but if he cannot, her nineteen-year-old son helps her. *Id.* Moreover, Plaintiff cannot take the kids out of the house by herself but is able to go if her boyfriend is with her. *Id.* at 76.

She goes to the grocery store once a month. *Id.* at 77. From time to time, she goes to Narcotics Anonymous meetings. *Id.* She has one friend who is an older lady. *Id.* Plaintiff tries to help her boyfriend clean the house but when she does too much, she has severe pain for two days. *Id.* at 82. She can put laundry into the washer and start it but cannot pull the clothes out and put them in the dryer. *Id.* at 77. She sometimes gets on the internet on her phone. *Id.* at 78. If she has to read something, she must read it four or five times before she can comprehend it. *Id.* She has to be reminded to take a shower and she does not brush her teeth. *Id.* at 79. Plaintiff has never had a driver's license. *Id.* at 68. When she tried to drive, she wrecked the vehicle. *Id.*

### B. Jeff Combs' Testimony

Mr. Combs, Plaintiff's boyfriend of seven years, testified at the hearing before ALJ Motta. *Id.* at 86. He worked full time until about five years before the hearing when he had to quit to help take care of their young children. *Id.* at 87. At the time of the hearing, Mr. Combs could only work part-time—two days a week—outside the home.

4

*Id.* at 87-88. He explained that it was difficult for him to find work because he does not know when Plaintiff will have an episode and he takes her to a lot of doctor appointments. *Id.* at 88. He found an employer who will allow him to work two days a week on his own schedule. *Id.* He cannot find a full-time job with that much flexibility. *Id.* When he is at work, their eighteen-year-old son comes over to help Plaintiff. *Id.*

Nonetheless, he sometimes has to leave work early to go home to intervene or help:

> I've had times where I've been at work and she called me just crying. I mean crying, breaking down or raising cane, cussing and when are you coming home? And … if she has too much time to think, she'll start thinking. It's almost … like she … pictures stuff and she believes what she's seeing but it's not real. I don't mean … hallucinations. I mean … she'll think I might be out running around on her …. And by the time I get home, she's furious because to her … it's real and it's not real.

*Id.* at 89-90.

Mr. Combs explained that Plaintiff has good days and bad days. On good days, she does not break down and cry, they can go for walks with the kids, and she will play with the kids. *Id.* at 90. On a bad day, "it's rough." *Id.*

> A typical bad day is she's mad…. [H]er anxiety is overwhelming. Every little thing will set her off and I have to be there … to help, to intervene because … her anxiety will get to the point that she will just shaking, crying and just you can't do it. I took her to Walmart for Christmas shopping and literally had to carry her out of Walmart. She broke down. Her anxiety there was too many people in there and she collapsed on the floor at Walmart. I had to pick her up and carry her out…. [I]t can be bad some times.

*Id.* at 92.  Mr. Combs estimated that, from a mental perspective, Plaintiff has bad days two or three days a week.  *Id.* at 91.

      **C.**      **Medical Opinions of Martha Rogers, Ph.D.**

Plaintiff began counseling with Dr. Rogers in June 2015.  Between June 2015 and March 2017, Dr. Rogers saw Plaintiff thirty-two times, and Plaintiff was late, cancelled the appointment, or did not show up on ten occasions.  *Id.* at 1559.  In September 2015, Dr. Rogers completed a mental status questionnaire.  She indicated that during sessions, Plaintiff sometimes stops the conversation and says, "I forget what we were saying."  *Id.* at 1233.  Plaintiff also reported that she forgets if she added something when cooking, gets off track when playing video games or watching movies, and forgets why she went into a room to do something.  *Id.*  Dr. Rogers noted that Plaintiff has anxiety when she goes into public places where there are several people and when she is around someone for an extended period of time.  *Id.*  She does not trust people, is paranoid, and believes people "do me wrong."  *Id.* at 1233.  She keeps the curtains closed or she will "freak out."  *Id.*  Her heart rate increases and she feels trapped, gets sweaty palms, and feels like she cannot breathe and is going to go crazy.  She is easily angered and avoids social interactions because she is afraid she will get angry.  *Id.*  Plaintiff is easily distracted, even in therapy sessions when she wants help.  *Id.* at 1234.  Dr. Rogers diagnosed post-traumatic stress disorder; generalized anxiety disorder; major depression, recurrent, moderate; and opioid-use disorder-on-maintenance therapy, mild.  *Id.*

In February 2016, Dr. Rogers provided a second assessment.  She noted that Plaintiff was extremely irritable with a labile mood and very poor judgment.  *Id.* at 1272.

6

She had limited education and thus a poor fund of knowledge. Further, she has poor concentration and short-term memory; great difficulty managing daily stressors; and "almost zero frustration tolerance." *Id*. She has "almost no activities or interests that bring her pleasure" and she cannot maintain social contacts. *Id.*

Dr. Rogers completed her last assessment in March 2017. She modified her previous diagnoses to PTSD with symptoms of major depression, generalized anxiety, panic attacks, inappropriate anger, rage, etc.; borderline personality disorder; and opioid use disorder, moderate, on maintenance therapy. *Id.* at 1559. She indicated Plaintiff's signs and symptoms include, for example, sleep disturbance, personality change, mood disturbance, social withdrawal or isolation, decreased energy, and persistent irrational fears. *Id*. Her treatment consists mainly of cognitive behavioral therapy with sessions that focus primarily on crisis management and anger management. *Id.* at 1560. Dr. Rogers opined that Plaintiff's impairments or treatment would cause her to be absent from work daily. *Id*. Further, if she no longer abused drugs and/or alcohol, she would still have severe underlying psychiatric conditions—PTSD and borderline personality disorder—that would markedly impair her ability to complete a normal work schedule. *Id.* at 1561. She is extremely quick to anger and then rage and cannot work with other people without frequent disruptive inappropriate displays of anger. Dr. Rogers indicated that Plaintiff had extreme functional limitations in many categories including, for example, difficulties in maintaining social functioning; her ability to understand, remember, and carry out detailed instructions; and her ability to set realistic goals or make plans independently of others. *Id.* at 1561-62.

**III.    Standard of Review**

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance ...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.   The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. She reached the following main conclusions:

Step 1:   Plaintiff has not engaged in substantial gainful employment since June 17, 2015.

Step 2:   She has the severe impairments of hepatitis C, anxiety disorders, depressive disorder, and polysubstance abuse disorder.

Step 3:   She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

| | | |
|---|---|---|
| Step 4: | | Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "a reduced range of medium work… subject to the following limitations: (1) lifting up to 50 pounds occasionally and 25 pounds frequently; (2) sit, stand, and walk six hours each during an 8-hour workday; (3) frequent postural activities, such as climbing stairs and/or ramps[,] balancing, stooping, kneeling, crouching, and crawling; (4) no climbing of ladders, ropes, or scaffolds; (5) no exposure to hazards, such as dangerous machinery or unprotected heights, and no driving as part of job duties; (6) limited to simple instructions[,] simple, repetitive tasks with simple decision-making; (7) low stress work, defined as no strict production quotas or fast pace and only routine work with few changes in the work setting; (8) no contact with the public as part of job duties; and (9) occasional contact with coworkers and supervisors with no teamwork or over-the-shoulder supervision." |
| Step 4: | | She is unable to perform any of her past relevant work. |
| Step 5: | | She could perform a significant number of jobs that exist in the national economy. |

(Doc. #6, *PageID* #s 39-56). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 56.

## V. <u>Discussion</u>

Plaintiff contends that the ALJ failed to reasonably and adequately weigh the opinions of her treating psychologist, Dr. Rogers; neglected to weigh to the opinions of consulting Psychological examiner, Dr. Johnson; and made unreasonable and unsupported findings regarding Plaintiff's daily activities.

The Commissioner maintains that substantial evidence supports the ALJ's decision.

A. **Medical Opinions**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to

any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

ALJ Motta found that Dr. Rogers' opinions are not entitled to controlling or deferential weight. Instead, she assigned "partial weight to the extent that the claimant does experience some functional difficulty due to her mental symptoms consistent with the findings set forth above." (Doc. #6, *PageID* #54). However, Dr. Rogers' opinion "is entitled to no weight to the extent that it purports to establish a condition of disability within the meaning of the Social Security Act or greater functional limitations than set forth herein." *Id.* The ALJ gave a few reasons for discounting Dr. Rogers' opinions, focusing primarily on inconsistencies between the opinions and other evidence of record.

The ALJ found that Dr. Rogers' mental status observations and treatment notes were not consistent with her opinions. According to the ALJ, Dr. Rogers' treatment notes "reflect no more than mild to moderate symptoms that consist generally of a depressed and irritable mood with some anxiety" and contain only Plaintiff's "subjective complaints of significant stressors and functional difficulty." *Id.* at 53-54. And, these notes are inconsistent with Dr. Rogers' opinion that Plaintiff experiences recurrent panic attacks and marked symptoms of anxiety and depression; has difficulty thinking or concentrating; and exhibits poor memory, emotional lability, pathological dependence, difficulty organizing a schedule, and social withdrawal or isolation.

There are two problems with the ALJ's reason. First, to assign controlling weight, a medical opinion must be "not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). The Social Security Administration defines "not inconsistent" as

12

"a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence … as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." Soc. Sec. R. 96-2p, 1996 WL 374188, at *3. ALJ Motta did not identify evidence that contradicts or conflicts with Dr. Rogers' opinion; she identified evidence that, according to her, reflects less severe limitations than Dr. Rogers' opinions (i.e., marked symptoms of anxiety versus some anxiety).

Second, substantial evidence does not support the ALJ's conclusion; Dr. Rogers' treatment notes support her opinions. Notably, Dr. Rogers provided detailed progress notes from June 2015 through April 2017. Indeed, her progress-note form has two primary sections for each appointment—"narrative/assessment/plan" and "areas of concern." For each appointment, Dr. Rogers completed the narrative section, detailing the topics she discussed with Plaintiff and issues that arose during each appointment. She intermittently checked various areas of concern. For example, under sleep, Dr. Rogers regularly checked the box indicating Plaintiff had insomnia. (Doc. #6, *PageID* #s 1278-79, 1488, 1491). Dr. Rogers also frequently noted that Plaintiff had poor recent memory, poor insight and judgment, and anxious or depressed moods. *Id.* at 1276-77, 1279, 1508-11, 1630-31. She likewise noted on several occasions that Plaintiff had pressured speech, was agitated, and had a labile affect. *Id.* at 1276-77, 1279, 1509.

The ALJ's conclusions regarding Dr. Rogers' treatment notes appear to be based primarily on Dr. Rogers' intermittent checkmarks rather than her narrative from each appointment. Importantly, Dr. Rogers' failure to check a box in each category does not

establish that Plaintiff had no issues or concerns related to that category.  For example, under appearance/grooming, Dr. Rogers rarely, if ever, checked any box.  However, that means that she did not check the boxes indicating Plaintiff had bizarre appearance/grooming, but she also did not check the box indicating Plaintiff's appearance/grooming was appropriate.

Further, at many of the appointments, Dr. Rogers' narrative provides context for the various areas of concern.  For instance, in September 2015, in the areas of concern section, Dr. Rogers indicated that Plaintiff had insomnia, poor appetite, irritable and anxious mood, appropriate affect, and fair judgment and insight.  *Id.* at 1488.  In the narrative section, Dr. Rogers noted that Plaintiff was anxious and could not sleep.  *Id.*  She was stressed about her utilities being turned off because her partner did not work all of his hours.  However, Plaintiff wanted help with the kids and felt too anxious to do it on her own.  When her partner left the house, she felt suspicious and jealous.  Plaintiff also reported that she was moving because their house was too crowded.  And, her dentist broke her tooth, gave a her a prescription for antibiotics, and told her he could not help her any more because it was too complicated.

At the next appointment, Dr. Rogers did not check any areas of concern.  *Id.*  However, Dr. Rogers noted that Plaintiff described her symptoms of anxiety, including, for example, she is afraid to answer or make phone calls and she avoids groups of people.  *Id.*  They also discussed her jealously that arises when her partner talks to others and her jealousy when her female friends talk to each other—because she is afraid they will reject her.

14

When Plaintiff returned the next week, Dr. Rogers indicated that she had an anxious and irritable mood, labile and full affect, pressured speech, poor insight and judgment, poor recent memory, and fair concentration. Dr. Rogers explained that Plaintiff was having trouble getting suboxone. *Id.* at 1279. Further, she was overwhelmed with her kids' behavior and felt guilty that she could not take care of her mother.

Shortly thereafter, Dr. Rogers indicated that Plaintiff had problems with insomnia in the middle of the night, an anxious and depressed mood, labile and full affect, poor insight and judgment, poor recent memory, and fair concentration. Plaintiff reported crying for two days because three of her friends were talking about her. *Id.* As a result, she did not feel like she could trust anyone. Dr. Rogers further detailed Plaintiff's recent contact with her mother. In November 2015, Plaintiff described PTSD symptoms of agoraphobia such as discomfort with crowds. She began explaining her childhood and young adulthood drug-use traumas. And, Plaintiff reported that she believes drugs saved her life because she otherwise would have killed herself. *Id.* at 1278. Together, these examples are only a small part of all of Dr. Rogers' treatment notes. And, contrary to the ALJ's finding, they are not inconsistent with Dr. Rogers' opinions.

The ALJ next points out that Dr. Rogers' assessments are not consistent with other sources' "essentially normal mental status examination findings," and Dr. Rogers' treatment notes "document no significant concentration or attention difficulty, infrequently note some memory difficulty." *Id.* at 54. The ALJ emphasized that a consulting psychologist, Dr. James, found that Plaintiff could follow basic work

15

instructions and should not work with the public. Although that is true, it only reflects part of Dr. James' opinion; ALJ Motta left out Dr. James' opinions that support Dr. Rogers' conclusions. For instance, Dr. James indicated that Plaintiff has "concentration and short-term memory difficulties which could lead to some difficulties within work situations." *Id.* at 1243. Further, Dr. James found that Plaintiff has a hard time managing her anxiety and stress, and she exhibits a quick temper and low frustration tolerance. *Id.* These findings by Dr. James—that the ALJ appears to have overlooked—are consistent with Dr. Rogers' assessments.

Moreover, the ALJ does not address the opinion of Dr. Johnson, another examining consultant. Although his exam was before Plaintiff's alleged onset date (by less than a year), his conclusions are nonetheless consistent with Dr. Rogers' opinions. For example, he found that she is "likely to experience some difficulties maintaining attention and concentration to perform simple, routine tasks. Limitations in this area would likely be the result of preoccupation with mental health symptoms." *Id.* at 712. By overlooking evidence that supports Dr. Rogers' opinions, the ALJ erred. "[A] substantiality of evidence evaluation does not permit a selective reading of the record. 'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted)).

The ALJ also discounted Dr. Rogers' opinions because Plaintiff's activities—specifically, NA meetings, grocery shopping, and auctions on Sundays—are "inconsistent with the rather dire reports Dr[.] Rogers has submitted." (Doc. #6, *PageID* #54). But ALJ Motta's focus on so few activities is misguided as she took these activities out of context. "[T]he ALJ's focus on the claimant's ability to do certain activities in discounting the treating source's opinion does not constitute "good reasons" for doing so when the claimant's testimony and other record evidence contradict the ALJ's finding." *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (citing *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 652 (6th Cir. 2011) ("The ALJ's focus on claimant's ability to do 'yard work' is misplaced ….")). Plaintiff's testimony and other evidence contradicts ALJ Motta's findings.

At the hearing, Plaintiff explained that when she does leave the house, she needs someone with her so she can focus all of her attention on that person and speak only to them. (Doc. #6, *PageID* #79). Further, Plaintiff testified that she goes to NA meetings "from time to time" and she only goes to the grocery store once a month. *Id.* at 77. At the same appointment that Dr. Rogers indicated Plaintiff went to an auction on Sunday, she also opined that Plaintiff had insomnia, an irritable mood, pressured speech, poor insight and judgment, fair concentration, and poor recent memory. *Id.* at 1278.

The ALJ concluded that the "only reasonable explanation for the discrepancy" between Dr. Rogers' treatment notes and her opinions "is the unquestioned acceptance of the claimant's subjective allegations and not a reliance on treatment and examination records." *Id.* at 54. However, this is not a reasonable assumption because Dr. Rogers did

17

not indicate that she relied only on Plaintiff's subjective reports and because physicians are trained to both consider and investigate subjective reports as opposed to blindly accepting them on face value.

ALJ Motta failed to provide good reasons, supported by substantial evidence, for rejecting Dr. Rogers' opinions. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[1]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the

---

[1] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

18

plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Supplemental Security Income should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Wendy Stewart was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

Date: November 20, 2019            *s/Sharon L. Ovington*
                                                     Sharon L. Ovington
                                                     United States Magistrate Judge